## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**RAYMOND DENNIS BAREFOOT,**

        **Plaintiff,**

  **v.**                                **Civil Action No. 2:17cv105**

**NANCY A. BERRYHILL,**
*Acting Commissioner of*
*Social Security,*

        **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff Raymond Barefoot seeks judicial review of the Commissioner of Social Security's denial of his claim for disability insurance benefits ("DIB"). Specifically, Barefoot claims that the Administrative Law Judge ("ALJ") failed to properly consider his claim under the criteria for amputation, one of the Listing of Impairments; that the ALJ failed to properly weigh the evidence in the record when evaluating opinions from Barefoot's treating physician, a state consultative examiner, and Barefoot's own testimony; and that, because the RFC was improperly formed, issued a finding not supported by vocational expert testimony. Barefoot claims correcting for these alleged errors could result in his being found disabled and therefore seeks remand of his claim. This action was referred to the undersigned United States Magistrate Judge pursuant to provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.

After reviewing the parties' briefs and the administrative record of the Agency's findings, this Report concludes that the ALJ complied with the law and regulations governing disability benefits under the Social Security Act. Accordingly, for the reasons stated in detail below, this

report recommends that the court AFFIRM the final decision of the Commissioner by GRANTING the Commissioner's Motion for Summary Judgment (ECF No. 14) and DENYING Barefoot's Motion for Summary Judgment (ECF No. 12).

## I.     PROCEDURAL BACKGROUND

On January 11, 2013, Barefoot filed an application for DIB. R. at 156-57, 168.  He alleged that he was disabled as of September 29, 2012, due to a crush injury to his left foot and the subsequent amputation of his left leg below the knee. R. at 168, 171.  The state agency denied his application initially and again upon reconsideration. R. at 93, 101.  Barefoot then requested an administrative hearing, which was conducted October 14, 2015. R. at 41-82.

The ALJ determined Barefoot was last eligible for DIB under the Social Security Act on March 31, 2013, identifying this as Barefoot's Date Last Insured ("DLI"). R. at 25.  The ALJ denied Barefoot's claim for DIB, finding he was not disabled between September 29, 2012, and March 31, 2013. R. at 33.  The Appeals Council denied Plaintiff's request for review on December 14, 2016. R. at 1-3.  Barefoot then filed the Complaint in the present action seeking review of the administrative proceedings. Compl. (ECF No. 1).

## II.     FACTUAL BACKGROUND

Barefoot was born in 1970. R. at 46.  On his DLI, he was 43 years old; at the time of the ALJ's decision, he was 45 years old.  He completed a GED, and has worked in construction. R. at 63.  Although he was primarily occupied prior to the accident caring for his young son, he had previously worked in construction as recently 2011. R. at 48, 52.  The relevant portions of Barefoot's medical history are summarized here, as are the portions of the administrative proceedings below that are relevant to her arguments in this court.

a.      History of Treatment.

On October 14, 2012,[1] Barefoot was in a motor vehicle accident.  R. at 45.  He sustained crush trauma to his left foot.  After efforts to treat the injured feet were unsuccessful,[2] Barefoot allowed his doctors to amputate the foot below his left knee on January 28, 2013.  R. at 261-62, 246-47.

During a follow-up examination ten days after the amputation, the orthopedic specialist who performed the surgery, Dr. Michael Campbell, noted that Barefoot was doing well.  He had "some phantom sensations but no severe phantom pain.  He has been intermittently using pain medication at this point . . . There is an outstanding appearance to the stump.  The staples are removed.  A soft dressing is applied.  He has full range of motion of the knee.  He has full range of motion of the hip."  R. at 258.  Dr. Campbell prescribed stump shrinkers and referred him to Coastal Orthotics for a prosthesis.

On February 6, 2013, Barefoot visited Coastal Orthotics to be fitted for a prosthesis.  R. at 282.  The Certified Prosthetics Orthotist who assisted him, Steve Siverd, observed Barefoot had a well-healing suture line with dog ears.[3]  Id.  A week later, Siverd noted Barefoot's stump had decreased in circumference.  Id.  Barefoot told the orthotist his phantom pains were increasing, but he was managing them with massage.  Id.

---

[1] The alleged disability onset date is September 29, 2012, even though Barefoot's accident occurred two weeks later. The parties make no mention of this discrepancy, so the court will not consider to have any significance.

[2] The wounds did not heal at least partly because Barefoot continued to smoke cigarettes during his convalescence and because he would not accept treatment from an in-home nurse.  R. at 261-62.

[3] A dog ear is a puckering of the skin that can occur after a surgical wound closure.  Although they can mar a surgical scar, there is no evidence the "dog ears" references in Siverd's notes required subsequent surgery to correct. See "Dog ear: an overview of causes and treatment," 83 Royal C. of Surgeons of Eng. 136, 136 (2001), available at National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2503349/.

3

During a follow-up examination with Dr. Campbell on March 8, 2013, Barefoot reported having fallen several weeks previous and that he was still in pain from that fall, though the pain was decreasing in intensity. R. at 256. Dr. Campbell observed, "Well-healed incision. Healing scab. Mild ecchymosis in the stump. Full range of motion of the knee and hip. No dog ears. Moderate swelling. No evidence of infection." Id. Dr. Campbell directed him to physical therapy once his prosthesis was fitted and prescribed Percocet for pain management. R. at 256.

Barefoot returned to Coastal Orthotics on March 14, 2013, for a trial fitting of his prosthetic leg. R. at 280. Although Barefoot required an "inner socket" and an extra sock to account for volume loss on his stump, he was able to use the prosthesis to walk in the parallel bars with the use of his right hand. Id. Siverd did record that Barefoot reported discomfort using the prosthesis, but Siverd also offered the opinion that the discomfort would decrease as Barefoot desensitized the residual limb to using the prosthesis. Id.

A week later, Siverd saw Barefoot again, noting he was "doing very well." R. at 279. Barefoot could walk with a walker and "bear[] slight pressure as he is ambulating." Id. Barefoot demonstrated "a good heel strike, mid stance and toe off and good weight shifting." Id. Barefoot did "not show any signs of discomfort in his gait pattern with his body motions or facial expressions." Id. Barefoot reported the overall fit of the prosthesis was comfortable. Id.

On April 11, Barefoot reported some "distal anterior tib pain" when using his prosthesis, but Siverd attributed this to Barefoot not using the correct thickness of sock lining. Id. Siverd directed Barefoot to return to Dr. Campbell to be prescribed a replacement socket because of how the stump's size changed as it healed. Id.

Barefoot's insurance plan did not cover the replacement socket for his prosthesis. R. at 278. Nevertheless, he secured funds for a replacement. In July, during a casting session for a

replacement socket, Siverd noted that Barefoot's gait was "fairly poor due to the ill-fitting socket." Id.

On August 22, 2013, after several test fittings and modifications to the replacement socket, Barefoot reported that the fit was "greatly improved." R. at 277. At the session during which Barefoot would take delivery of the replacement socket, Siverd observed Barefoot could "ambulate in the office without any distal end pressure." Id.

During another session at Coastal Orthotics On August 30, 2013, Barefoot reported the replacement socket's fit was "greatly improved" over the original socket. R. at 276. Siverd noted that Barefoot could walk without the use of a single point cane, though he would occasionally use the cane because walking long distances caused him pain. Id. Barefoot stated "that his limb pain is decreasing on a daily basis." Id.

On September 25, 2013, Barefoot was able to walk in the Coastal Orthotics office without the use of any assistive device. R. at 290. Siverd made some modifications to the length of the prosthesis' pylon and ordered more socks to adjust the fit for the still-shrinking stump. Id. Barefoot asked about ordering a third socket, but opted to use socks to adjust the fit because of the cost of fabricating a new socket. Id.

Dr. Campbell examined Barefoot again In December 2013. R. at 311. Campbell noted Barefoot "was having some pain with irritation around the proximal fibular from the peroneal nerve." Id. Campbell also observed that the "actual stump is doing quite well." Id. Barefoot was not experiencing any significant phantom pains but did have some phantom sensation. Id. Barefoot could walk with an antalgic gait. Id. He had full motion of the knee. He had some irritation of the skin of the lateral aspect of the leg. Id. Dr. Campbell noted that Barefoot's socket fit well and that his hip and knee strength were "excellent." Id. Dr. Campbell recorded

that Barefoot would benefit from physical therapy but could not afford it. Id. He also noted his opinion that Barefoot could never return to manual labor and that Barefoot would consequently need retraining to a sedentary job. Id.

In addition to his treatment related to the amputation of his left foot, Barefoot has also been diagnosed and treated for opioid dependence. R. at 316. From April 2012 to April 2013 and again from October 2014 to the date of the hearing, Barefoot was under care from an addiction specialist medical doctor named Robert Lowe. R. at 314-29. During his testimony at the hearing, Barefoot did not offer a coherent explanation for this 16-month gap in treatment for his addiction. See R. at 71.

In May of 2015, more than two years after the amputation, Dr. Campbell first recorded that Barefoot was experiencing pain in his hip. R. at 309. This is the first indication of Barefoot's hip pain in the medical record. Previous examinations revealed full range of motion in his hips. See, e.g., R. at 258 (from Campbell in February 2013: "He has full range of motion of the hip."); R. at 256 (Mar. 7, 2013: Dr. Campbell observes full range of motion in hip); R. at 256 (Dr. Campbell on March 8, 2013: "Full range of motion of the knee and hip."). During Barefoot's alleged period of disability, there was no indication in the medical records of hip pain that would have limited his functioning and lasted for more than 12 months.[4]

---

[4] Because Barefoot only makes a claim for DIB, he must prove that, between his alleged onset of disability and his DLI, he had a disabling condition that could be expected to last at least 12 months. See 20 C.F.R. § 404.1505(a). Although he was permitted to offer evidence generated after his DLI but that still relates substantially to a disabling condition during the alleged period of disability. See Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 341 (4th Cir. 2012). Because Barefoot identifies no evidence suggesting his hip bursitis caused him disabling pain during the alleged period of disability, the ALJ was not required to examine the impact of his hip pain in deciding this application for DIB.

6

b.    Evaluation Evidence.

Dr. Campbell completed a "Physical Capacities Assessment" for Barefoot on January 9, 2014.  Campbell opined Barefoot could not stand or walk without difficulty even for household distances and that he was in pain requiring daily medication.  R. at 305-07.  The doctor offered the opinion that Barefoot would need frequent breaks throughout a workday to remove his prosthesis to mitigate irritation from it.  R. at 307.  He also wrote that Barefoot could not "tolerate even sedentary work at this point."  He estimated Barefoot would  be off task 80% of a workday and would not be able to report to work 15 days per month on average due to pain.  R. at 305.

In October 2013, Dr. John Shane, a state medical consultant, reviewed Barefoot's treatment records.  He determined Barefoot could lift 20 pounds occasionally and 10 pounds frequently; could stand or walk for about two hours out of an eight-hour workday; and could sit for five hours in an eight-hour workday.  R. at 89.  He noted limitations in operating foot pedals and in climbing, crawling, and in navigating hazards and heights in general.  R. at 88-89.  The consultative expert wrote, "Symptoms are exaggerated—at this point in time, his artificial prosthesis is expected top [sic] far advanced from his stated capability.  Records reflect that he is more capable than he admits.  Allegations are partly credible."  R. at 89.  Dr. Shane recommended a finding of "Not Disabled."  Id.

In March 2014, another state consultative expert, Dr. Robert Weisberg, reviewed Barefoot's records a second time and reached the same conclusion as Dr. Shane: "Not Disabled." R. at 96, 99.

c.   Testimony Before the Administrative Law Judge.

Barefoot testified before the ALJ at his hearing. R. at 45-72. He told her he had been engaged in odd jobs before his accident but that his primary occupation had been caring for his son. R. at 45-46. He testified that he preferred not to drive, though he was able to drive 45 minutes to attend the hearing. R. at 49-50. He told the ALJ he is unable to work due to the pain from his injury and amputation. R. at 57 ("[M]y function at home, I mean basically I kind of lay down in bed. I don't really do any cooking or anything. It's just the pain . . . And my mind span as far as paying attention to things, I can't even seem like I can pay attention to things."). He told the ALJ he had been able to walk well with his prosthetic leg "the first month or so" and then "I don't know what happened with the nerve, but something happened. The nerves really started bothering me." R. at 58. He testified he felt he needed a new prosthetic leg but that he was unable to afford one. Id. He testified he still felt phantom pains. R. at 69-70. He testified that, on a typical day "I pretty much stay in bed and watch TV all day. Read Books. I'll read a book. . . . I like John Grisham, stuff like that. I'll read through that." R. at 65.

The ALJ also elicited testimony from Edith Edwards, a vocational expert ("VE"), to assist him in determining whether there were jobs in the national economy Barefoot was capable of performing. See R. at 72-81. She presented the VE with the following hypothetical person: someone of Barefoot's age, education, and work background who

> is [INAUDIBLE] lifting, carrying, pushing, and pulling up to 10 pounds; could be standing and walking for approximately two hours per eight hour workday; sitting for approximately six hours per eight hour workday, with normal breaks. Occasional climbing of ramps and stairs; balancing, stooping crouching; never kneeling; never crawling; never climb ladders, ropes or scaffolds. The individual should have no operation of foot controls with the left lower extremity. And the individual is precluded from work involving driving motor vehicles [INAUDIBLE] trucks and automobiles; barred from working in close proximity to wet, slippery surfaces, uneven terrain, unprotected heights, and moving

8

machinery. The individual should also avoid concentrated exposure to extreme cold, extreme heat, and humidity.

R. at 74-75. The VE testified that there were jobs in the national economy in significant numbers a person so situated could perform. R. at 75. She identified unskilled office clerk/addressing clerk, with 137,500 jobs nationally; ticket checker, with 55,000 jobs nationally; and order clerk, with 212,500 jobs nationally. Id. All three jobs were unskilled, sedentary work. Id. When asked what difference it would make if the hypothetical person had to sit or stand every 30 minutes but would be able to remain on task, the VE testified it would make no difference. Id. Also, if the hypothetical person was unable to perform complex tasks but could perform simple, repetitive tasks, that would not affect the number of jobs available in the national economy. Id. The VE also told the ALJ such an individual would be able to work in jobs available in significant numbers in the national economy so long as he was able to stay on task at least 90% of the time and miss work no more than two days per month. R. at 76. The VE also testified such a person could have the need to take breaks of "a few minutes" outside the normal routine of the workday without diminished employability. Id.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere

scintilla" of evidence, but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits, and be under a "disability" as defined in the Act. 42 U.S.C. §§ 416(i), 423. The Social Security Regulations define "disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A).  To meet this definition, a claimant must have a "severe impairment" that makes it impossible to do previous work or any

other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability.  The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.  The five questions which the ALJ must answer are:

(1)   Is the individual involved in substantial gainful activity?

(2)   Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

(3)   Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

(4)   Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

(5)   Does the individual's impairment or impairments prevent him or her from doing any other work?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.  An affirmative answer to question three or five establishes disability.  See 20 C.F.R. §§ 404.1520, 416.920.  The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Lewis, 858 F.3d at 861 (citing Monroe v. Colvin, 826 F.3d 176, 179-80 (4th Cir. 2016)).  When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the

11

subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age.   Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)).   At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

In this case, after conducting the foregoing analysis, the ALJ concluded that Barefoot met the insured status requirements from his alleged disability onset date, September 29, 2012, through his date last insured, March 31, 2013, and had not been under a disability within the meaning of the Social Security Act during that time. See R. at 27, 33.

At step one, the ALJ found Barefoot had not engaged in substantial gainful activity from his alleged disability onset date to her date last insured. R. at 27.  At step two, the ALJ found that Barefoot suffered from left knee amputation, which was a severe impairment. Id. (citing 20 C.F.R. § 404.1520(c)).  At step three, the ALJ found that Barefoot did not suffer from a listed impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Id. At step four, the ALJ found that Barefoot had past relevant work at the substantial, gainful activity level as a construction worker, grade foreman, pipelayer, and demolition worker, all heavy jobs. R. at 31.  The ALJ determined Barefoot could perform none of this past work due to his severe impairment. Id.  The ALJ then developed a finding regarding Barefoot's RFC, determining that he had

> the residual functional capacity to perform less than the full range of sedentary work as defined in 20 § C.F.R. 404.1567a). The claimant was capable of lifting, carrying, pushing, and pulling up to 10 pounds occasionally.  He was capable of standing and/or walking for approximately 2 hours per 8 hour workday and sitting for approximately 6 hours per 8 hour workday, with normal breaks.  Claimant was able to occasionally climb ramps and stairs, balance, stoop, and crouch. However, he was never able to kneel, crawl, climb ladders, ropes or scaffolds. Furthermore, he could not perform operation of foot controls with the left lower extremity.  The claimant was precluded from work involving driving motor vehicles such as forklifts, trucks, and automobiles, as well as from working within

12

close proximity to hazards of wet, slippery surfaces, uneven terrain, unprotected heights, and moving machinery. He also should have avoided concentrated exposure to extreme cold, extreme heat, and humidity. He was unable to engage in complex tasks but could perform simple, routine and repetitive tasks consistent with unskilled work and was able to sustain and attend to task throughout the eight-hour workday.

R. at 28. At step five, relying on the testimony of the VE, the ALJ concluded that jobs existed in significant numbers in the national economy which Barefoot could perform. R. at 32-33. Consequently, the ALJ determined Barefoot did not have a qualifying disability during the relevant period and denied his claim for DIB. R. at 33.

Barefoot now argues the ALJ erred in three ways. First, he asserts the ALJ failed to adequately explain why his left knee amputation did not meet or equal a Listed Impairment ("Listing"). Pl.'s Mem. at 13 (ECF No. 13). Second, he asserts the ALJ erred in weighing the evidence in the record, in particular the opinions of Barefoot's treating orthopedist, Dr. Campbell, and a state medical consultant. Id. at 16. Third, he argues the ALJ failed to properly assess Barefoot's allegations of disabling pain when determining his RFC. Finally, Barefoot argues that, since the RFC was not properly formed, it was error for the ALJ to have relied on testimony from the VE that was offered in response to that allegedly incomplete RFC.[5]

a.   The ALJ properly evaluated Barefoot's impairments at step three, and supported with substantial evidence her finding that his left knee amputation did not meet or equal a Listing.

"The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). A claimant is entitled to this conclusive presumption of impairment

---

[5] This last argument is duplicative of any of the other three. The court therefore considers it alongside them: if the RFC was not properly determined, remand will be justified because the VE's testimony was based on that inaccurate RFC.

"if he can show that his condition 'meets or equals the listed impairments.'" Id. (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)).   To meet the requirements of a listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).   An ALJ is obliged to explain his findings in sufficient detail to allow a court to determine if they were supported by substantial evidence.   Radford, 734 F.3d at 291.   Barefoot asserts the ALJ erred by not explaining in enough detail why he found that his amputation did not meet or equal a Listing under 20 C.F.R. § 404.200.   Pl.'s Mem. at 16-19 (ECF No. 13).

A claimant for disability benefits under one of the Listings must show she meets all criteria for that Listing, and the burden is on her to demonstrate the same.   See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)[6]); Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).   A claimant's impairment meets or equals the Listing for amputation with the loss of "[o]ne or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00(B)(2)(b), which have lasted or are expected to last for at least 12 months." 20 C.F.R. § 404, Subpart P, App'x 1(1.05).   Inability to ambulate effectively means an extreme limitation of the ability to walk, such that a claimant cannot independently initiate, sustain, or complete activities.   20 C.F.R. § 404, Subpart P, App'x 1(1.00(2)(b)(1).

In this case, the ALJ's opinion recites the relevant Listing, including its proper elements. See R. at 28.   The ALJ then described and analyzed the evidence supporting her finding that Barefoot's impairments did not meet the listing for amputation.   Specifically, she noted,

---

[6] SSR 83-19 has been rescinded in part to the extent it addressed the procedures used to determine disability in children.   It otherwise remains an accurate representation of the Social Security Administration's policies and regulations. See SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

"Medical evidence prepared on March 21, 2013, demonstrates that claimant was making sufficient progress while ambulating with a four-posted walker. Thus, Dr. Steve Siverd[7] . . . concluded that the need for physical therapy was low. Dr. Siverd added, 'He demonstrates a good heel strike, mid stance and toe off and good weight shifting. He does not exhibit any signs of discomfort in his gait pattern with his body motions or facial expressions. He states that the overall fit of the prosthesis feels comfortable.'"

R. at 28 (citations omitted) (citing R. at 279). There is also considerable consistent evidence elsewhere in the record that Barefoot had no extreme inability to ambulate using his prosthetic leg for 12 months after the amputation. See, e.g., R. at 256 (Mar. 7, 2013: Dr. Campbell observed well-healed incision, mild bruising, full range of motion in knee and hip, no evidence of infection); R. at 277 (30 Aug., 2013: during test fitting of prosthesis, Barefoot walking despite his tibial tubercal and lateral tibial plateau being "a bit tender"); R. at 311 (Dec. 30, 2014: Dr. Campbell noted Barefoot having "antalgic gate . . . full motion of the knee . . . some irritation of the skin of the lateral aspect of the leg . . . socket fits well . . . hip and knee strength is excellent.").

Because the ALJ identified substantial evidence supporting her finding that there were no complications with Barefoot stump that would have resulted in an extreme inability to ambulate within the 12 months following the amputation, there is no error justifying remand.

b.  The Administrative Law Judge properly assessed the opinions of Barefoot's treating and evaluating physicians in light of Lewis v. Berryhill.

Barefoot also objects to the weight assigned by the ALJ to opinions of his treating orthopedist, Dr. Campbell, and of a state medical consultant. Barefoot contends his RFC would have been more restricted if the ALJ had assigned the proper weight to the doctors' respective

---

[7] The ALJ seems to have mistaken Siverd for a medical doctor. As a Certified Prosthetist Orthotist, however, Siverd had expertise in fabricating and fitting prosthetic limbs that make his opinions valuable evidence in assessing Barefoot's claims. Medical evidence from the orthotist's records can still be used in a disability determination. See 20 C.F.R. §§ 404.1513(d); 416.913(d).

opinions.

An RFC is the plaintiff's maximum ability to work despite her impairments.  20 C.F.R.

§ 404.1545(a)(1); see also Social Security Ruling 96-9p, 1996 WL 374185 (July 2, 1996) ("RFC

is the individual's maximum remaining ability to perform sustained work on a regular and

continuing basis.").  The RFC is used to determine whether the claimant can perform his past

relevant work or adjust to other work that exists in the national economy.  20 C.F.R. §§

404.1545(a)(5)(i),  404.1545(a)(5)(ii).   The  ALJ  determines  a  claimant's  RFC  at  the

administrative hearing level, and considers all of the relevant medical and other evidence[8] in the

record.  Id. §§ 404.1527(b), 404.1545(a)(3), 404.1546(c).  "[R]elevant evidence . . . includ[es]

information  about  the  individual's  symptoms  and  any  'medical  source  statements'  –  i.e.,

opinions about what the individual can still do despite his or her impairment(s)—submitted by an

individual's treating source or other acceptable medical sources."  SSR 96-8p, 1996 WL 374184,

at *2 (July 2, 1996).

When the record contains a number of medical opinions from different sources that are

consistent with each other, the ALJ is required to use that evidence to make a determination on

disability.   20  C.F.R.  §§  404.1527(c),  416.927(c).   If,  however,  the  medical  opinions  are

inconsistent with each other or with other evidence before the ALJ, she must evaluate the

opinions and assign them persuasive weight to properly analyze the evidence involved.  20

C.F.R. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).  A treating source's opinion must be

given controlling weight if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20

---

[8] "Other evidence" includes "statements or reports from [the claimant], [the claimant's] treating or nontreating
source, and others about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to
work, and any other evidence showing how . . . how impairment(s) and any related symptoms affect [the claimant's]
ability to work.  20 C.F.R. § 404.1529(a).

C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lewis, 858 F.3d at 869; Craig, 76 F.3d at 590; SSR 96-2p (July2, 1996).   Notwithstanding this preference for giving a treating source controlling weight, the regulations do not require that the ALJ accept opinions from a treating source in every situation.  For instance, the ALJ need not give a treating source controlling weight when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.   20 C.F.R. §§ 404.1527(d), 416.927(c)(3)-(4), (d).

An ALJ can only discredit the opinions of treating physicians if there is medical evidence in the record conflicting with those opinions and if he explains why he favored the conflicting evidence over the treating providers' opinions.  Lewis, 858 F.3d at 869.  It is not sufficient for the ALJ to "cherry pick facts that support a finding of non-disability while ignoring evidence that supports a disability finding."  Id. (citing Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010)). If the ALJ satisfactorily explains why she discredited the treating source's opinions, a court generally should not disturb an ALJ's decision on the issue absent some indication that the ALJ "dredged up 'specious inconsistences.'"  Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (citing Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992)).

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ— not the treating source—with the

authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-3p (Aug. 9, 2006).

In this case, the ALJ specifically assigned little weight to certain opinions of Dr. Campbell, Barefoot's treating orthopedist. Dr. Campbell concluded in a January 2014 "Physical Capacities Assessment" that Barefoot could not perform sedentary work because he could not sit for two hours or stand for more than one hour and because he would be "off-task" for more than 80% of a workday due to pain. R. at 31 (citing R. at 306-07). The ALJ discounted these opinions because "This level of pain is not documented in the doctor's treatment notes. Moreover, this level of pain is not consistent with the claimant's testimony regarding his reading of novels." R. at 31. Barefoot argues this assessment is insufficient under the rules and not supported by the evidentiary record. The court disagrees.

To begin with, although Barefoot emphasizes the ALJ's summary of the explanations, she carefully reviewed all the medical evidence, including the records of Dr. Campbell's treatment both before and after Barefoot's DLI. The only opinion which she specifically discounted does not appear in those medical records, but in an "Assessment" Dr. Campbell completed. Such check-the-box forms without any medical explanation or justification are not entitled to great weight, even when completed by a treating physician. Leonard v. Astrue, No. 2:11cv48, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)). In addition, a significant portion of the opinions in the form relates to the ultimate issue of disability, which is always reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d). It was therefore not error requiring remand for the ALJ to discount the

weight she gave to the document.  However, even considering the "Assessment" as a medical opinion, the ALJ's decision to afford it little weight was supported by substantial evidence.

The ALJ did not merely conduct the sort of "cursory analysis" the Fourth Circuit found inadequate in Lewis.  See 858 F.3d at 867-68.  Rather, she reviewed Campbell's own extensive records of treatment and identified medical opinions in Dr. Campbell's records contradicting the opinions in the check-the-box form.  She then resolved the contradiction relying on the documents generated to manage Barefoot's actual treatment rather than on the document generated in support of his disability claim.  The ALJ noted Dr. Campbell's treatment notes record phantom sensations but no significant pain in December 2013, a direct conflict with Campbell's opinion on the January 2014 form.  R. at 31 (citing R. at 309).  The ALJ also noted that Barefoot's testimony that he could read novels for entertainment conflicted with Dr. Campbell's opinion that he could only concentrate for one fifth of the workday.  R. at 31 (citing R. at 65).

It is significant to note that, unlike in Lewis, where the ALJ disregarded entirely the opinions of the claimant's treating physicians, the ALJ here closely scrutinized Dr. Campbell's records from treating, examining, and evaluating of Barefoot's condition.  The record does not evince a "cursory" treatment of the doctor's opinions at all: rather, the ALJ applied a critical reading to the records, resulting in the identification of obviously contradictory evidence about Barefoot's capacities to work even in sedentary occupations.  Because the opinions from Dr. Campbell in the check-the-box form regarding Barefoot's ability to function in a sedentary job were in conflict with other medical evidence in the record—including evidence Dr. Campbell produced himself—the ALJ was not required to give the form opinions controlling weight.  See Craig, 76 F.3d at 590.  That she opted to discredit those opinions was a decision committed to

her judgment alone, and she persuasively explained the reasons for her conclusion in her opinion. Dunn, 607 F. App'x at 267.

Barefoot also argues the ALJ failed to adequately explain why she discounted weight she gave to one of the state agency consultative expert's opinions. R. at 31. The ALJ only gave "partial" weight to the opinion of the state expert, Dr. John Shane, that Barefoot could only sit for two hours at a time. Although Barefoot only makes passing references in his brief to an argument against this assignment of credibility, see Plaintiff's Memorandum at 13, 16-20 (ECF No. 13), the court will consider it.

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a State Agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to State Agency opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e); see 20 C.F.R. §§ 404.1513a, 416.913a.

Here, the ALJ appears to have discredited the opinion of Dr. Shane regarding Barefoot's ability to sit for extended periods for much the same reason she discredited Dr. Campbell's opinion on the same subject: there was nothing in the treatment records to support the conclusion that Barefoot was in pain prior to his DLI that would have limited his ability to sit still for extended periods. See R. at 31.

Barefoot argues the ALJ committed error requiring remand by mistakenly concluding that Shane was not a medical doctor and therefore failing to consider his opinion to be medical evidence. See Pl.'s Br. at 16, n. 2 (ECF No. 13). In fact, the ALJ was careful not to make

precisely this mistake.  In her opinion, she noted her confusion as to whether Dr. Shane was a medical doctor or whether he was simply a "single decision maker," whose opinions are not medical evidence.  In either case, the ALJ explained that she found Shane's opinions unhelpful, explaining her reason for discounting the opinion if he was a doctor or for ignoring it entirely if he was a single decision maker creating non-medical evidence.  In either case, she pointed out that there was no support in the treatment records to support Dr. Shane's opinion about the limits on Barefoot's ability to sit.  Her decision to discount Shane's opinion was supported by substantial evidence.  There was therefore no error in that decision warranting remand.

c.     The Administrative Law Judge's decision to discount the weight she gave to Barefoot's testimony of disabling pain was supported by substantial evidence.

The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.  Craig, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186 (July 2, 1996).  The first step is to determine whether there is an underlying medically-determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  Id.; SSR 96-7p at *1-3.  The ALJ must consider all the medical evidence in the record.  Craig, 76 F.3d at 594-95; SSR 96-7p at *5 n. 3; see also SSR 96-8p at *13 (the "RFC assessment must be based on all of the relevant evidence in the case record") (emphasis added).  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  Craig, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's

21

statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. Craig, 76 F.3d 595-96; SSR 96-7p, at *5-6, 11.

In evaluating the evidence in an appeal of a denial of benefits, the court does "not conduct a de novo review of the evidence, Smith, 795 F.2d 343, 345 (4th Cir. 1986), or undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Hancock, 667 F.3d at 472. Rather, "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." Smith, 99 F.3d at 638. When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam).

The ALJ determined Barefoot's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that his statements at the hearing regarding the intensity, persistence, and limiting effects were not credible. R. at 29. The record was replete with notes and observations that Barefoot's condition improved throughout the first year after his amputation prior to and immediately after his DLI. This directly contradicts his testimony about the pain he experienced during that time. For instance, even as early as February 2013, he was "working as a contracture [sic] while he is recovering from his amputation." R. at 282. Contra R. at R. at 51-52 ("I don't know why they'd say I'd been working. I'm not able to work. I haven't done any work."). In March of 2013, Barefoot could walk with a walker and "bear[] slight pressure as he is ambulating." R. at 279. Barefoot demonstrated "a good heel strike, mid stance and toe off and good weight shifting." Id. He did "not show any signs of discomfort in his gait pattern with his body motions or facial expressions." Id. Barefoot reported the overall fit of his prosthesis was comfortable. Id. By August 2013, Barefoot reported a good fit with his

prosthetic leg's socket, and the orthotist, Siverd, noted that Barefoot could walk without the use of a single point cane, though he would occasionally use the cane to walk long distances. Id. In that same August session, Barefoot told Siverd "his limb pain is decreasing on a daily basis." Id. In September 2013, Barefoot was able to ambulate without the use of any assistive device. R. at 290.

The credibility of Barefoot's testimony that his pain was disabling to the extent that it prevented him from concentrating on a task was undermined by his own testimony that he read novels for entertainment and was able to care for his minor son. R. at 65.

Additionally, and appropriately, the ALJ relied on Barefoot's "poor work history, together with drug and criminal histories," to discount Barefoot's subjective testimony about his condition after the amputation. See R. at 30; Thompson v. Colvin, No. 7:13cv32, 2014 WL 4792956, at *15 (W.D. Va. Sept. 25, 2014) (inconsistencies in describing work history, criminal background, and history of substance abuse all legitimate bases to discredit a claimant's subjective complaints of pain). Here, even before his amputation, Barefoot had a poor history of employment. He had numerous odd jobs for which he did not report his income to taxing authorities. See R. at 48.

These contemporaneous observations and notes of comments from Barefoot himself contradict his testimony at the hearing in 2015 that he was in severe, disabling pain. Because the ALJ's decision to discount the credibility of Barefoot's testimony was based on the substantial evidence described above, that decision does not warrant remand.

## V.    **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 14), and DENY Barefoot's Motion for Summary Judgment (ECF No. 12).

## VI.    REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file written objections to the foregoing findings and recommendations within fourteen days from the date of service of this Report on the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

February 21, 2018